IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No. 11-cv-00813-RBJ-CBS

DANIEL SELF,

      Plaintiff,

v.

KEVIN MILYARD, et al.,

      Defendants.

## ORDER

      Daniel Self, an inmate at the Sterling Correctional Facility of the Colorado Department of Corrections ("CDOC"), asserts §1983 claims under the Eighth and Fourteenth Amendments.  His claims fall into two separate parts, one arising from an incident in which he claims he was resuscitated despite a Do Not Resuscitate ("DNR") directive, and the other arising from allegedly inadequate treatment for a wrist injury.  Because of this Court's prior order partially granting a motion to dismiss, and because of Mr. Self's voluntary dismissal of certain defendants, the case now consists of two remaining claims against three defendants.  The matter is back before the Court on the remaining defendants' motion for summary judgment.  [docket #47].

### Facts

      Mr. Self is serving a life sentence with no opportunity for parole.  On January 22, 2009, after speaking with Dr. Gary Fortunato, a CDOC physician at the Sterling Correctional Facility, Mr. Self executed a DNR directive (also referred to as a CPR Directive) on a form provided to

him by the prison's medical staff.  The directive ordered "emergency medical services personnel, health care providers, and other persons to withhold cardiopulmonary resuscitation in the event that [Mr. Self's] heart or breathing stops or malfunctions."  CPR Directive [#47-5].  Mr. Self alleges that CDOC medical staff promised that emergency responders would not initiate cardiopulmonary resuscitation on him under any circumstances, and that a copy of the directive would be placed in his medical chart.  Am. Compl. [#5] ¶ 45.

Notwithstanding those assurances, Mr. Self claims these individuals did nothing to make other health professionals aware of the directive.  He attributes this to a CDOC policy of not allowing inmates who sign a DNR directive to wear a unique bracelet, or necklace or other means of alerting emergency responders to the existence of the inmate's DNR directive.  Mr. Self also claims that CDOC staff failed to adhere to administrative regulations requiring staff to place an orange sticker on the outside of his medical chart so emergency medical personnel would be aware of his DNR directive.  See CDOC Admin. Reg. 700-27, *available at* http://www.doc.state.co.us/administrative-regulations.

On April 4, 2009, at approximately 9:55 p.m., Mr. Self was found unconscious and unresponsive in his cell.  Incident Reports [#64-8].  Prison staff unsuccessfully attempted to revive him, and an ambulance was called.  *Id*.  All medical staff members who worked at the prison clinic were no longer on duty.  Dowis Aff. [#47-3].  Once the ambulance arrived, the medics performed a nasal intubation by inserting a tube through Mr. Self's nose and into his throat.  Frantz Aff. [#47-1] ¶ 13.  Mr. Self was taken to the hospital for further treatment, and the emergency room physician's notes indicate "respiratory arrest."  [#64-5].  Mr. Self was extubated the next day and released to CDOC on April 6, 2009.  *Id*. ¶ 21-23.  He later filed a grievance with CDOC for violation of his DNR directive.  See Resp. to Grievance [#64-9].  He

received a response that indicated that emergency medical personnel "are trained to respond to unresponsive persons in a certain way and will do so no matter what the situation. Since they do not have access to your records they would not realize that you had CPR Directive signed and in your chart." *Id.*

Mr. Self maintains a §1983 claim against the warden at the time, Kevin Milyard, for violation of his Fourteenth Amendment due process right to refuse unwanted medical treatment. Defendant seeks summary judgment, arguing that the DNR directive was not violated, but that even if it was, CDOC has a legitimate penological interest in prohibiting a visible means of alerting other persons regarding an inmate's DNR directive.

Mr. Self has also asserted an Eighth Amendment claim for deliberate indifference to his serious medical needs arising out of a wrist injury he sustained when he fell out of his top bunk on October 5, 2009. Mr. Self had surgery by an orthopedic surgeon on his wrist four days later, and he received Tylenol 3 and ice for treatment after his surgery. [#47-1] ¶¶ 25-26. Dr. Fortunato, who was an in-house physician, not the specialist who performed the surgery, noted that Mr. Self should have a follow-up evaluation in 7-10 days. *Id.* According to an October 28, 2009 documentation by Dr. Fortunato, Mr. Self still had not had his follow-up evaluation. *Id.* ¶ 27. Dr. Fortunato also noted that Mr. Self was in a cast, could move all fingers without difficulty, and had no edema, erythema or bruising. *Id.* Dr. Fortunato told Mr. Self to "kite" if he had any further problems, meaning Mr. Self should use the standardized paper forms available to inmates to communicate an issue the inmate is having. *Id.*; Dowis Aff. [#47-3] ¶¶ 14-15.

On November 4, 2009[1], Mr. Self was evaluated by an orthopedic specialist, Dr. Fenton (but not the surgeon who performed the initial surgery), who documented some dorsal shift in the

---

[1] Plaintiff adopts defendants' set of facts until November 4, 2009 with respect to his wrist injury. The Court notes that defendants rely almost entirely upon Dr. Frantz's affidavit for the vast majority of its facts. Dr. Frantz has

fracture fragments.  Fenton Depo. [#64-3] at 11-12.  Dr. Fenton indicated that a follow-up should occur within one month to evaluate whether another surgery would be necessary, and Dr. Fenton says that he sent his findings to Sterling Correctional Facility's clinic.  *Id*. at 18:1-20.

A one-month follow-up did not occur.  Mr. Self states that he submitted kites repeatedly asking to see Dr. Fenton for a follow-up appointment, including some six to eight kites within a two week span.  However, he says he did not receive a response to any of them.  Self Depo. [#64-4].  One such kite was documented by Dr. Fortunato on December 7, 2009, in which Mr. Self sought Motrin for a "botched surgery."  [#47-1] ¶ 30.  However, no prescription was renewed.  Dr. Fortunato documented that he reviewed the medical record, but there is no indication in the record that he reviewed Mr. Self's need for a follow-up appointment.  *Id*.

While he was waiting to see Dr. Fenton Mr. Self did see CDOC medical staff.  On February 1, 2010, as a result of a medical kite Mr. Self submitted, he saw Defendant Chamjock, a physician's assistant at Sterling Correctional Facility.  Chamjock Aff. [#47-4].  Mr. Chamjock says Mr. Self sought help for snoring problems, and when he asked if Mr. Self had any other medical complaints at the end of the appointment, Mr. Self said no.  *Id*. ¶ 46-48.  As a result, Mr. Chamjock says he administratively closed out any pending kites.  *Id*. ¶ 49.

Ultimately, Dr. Fenton did not see Mr. Self until June 11, 2010, over six months after the last time he treated Mr. Self.  It appears that this appointment was finally scheduled when Dr. Fenton requested x-rays and a follow-up appointment.  [#47-1] ¶¶ 33-37.  Dr. Fenton noted that the fracture was "oddly healed," and he determined corrective surgery was needed.  Fenton

---

clearly reviewed all of Mr. Self's medical files and any relevant CDOC documentation.  However, the Court also appreciates plaintiff's objection that parts of her affidavit are her "interpretation of the evidence the parties have shared through discovery."  [#59] at 3, n. 1.  It appears that plaintiff intended to file a motion to strike portions of Dr. Frantz's affidavit but never did so.  Nonetheless, the Court only relies upon Dr. Frantz's factual accounts of the record to the extent that Mr. Self does not dispute them, unless otherwise noted or discussed.

Depo. [#64-3] at 23-24.  Mr. Self had this corrective surgery on September 4, 2010[2].  [#47-1] ¶ 42.  Mr. Self was evaluated by Dr. Fortunato on September 23, 2010, and a request for additional narcotic medication was denied.  *Id.* ¶ 43.

Mr. Self claims he received inadequate care for his broken wrist rising to the level of deliberate indifference to serious medical needs.  Mr. Self asserts these claims against the three remaining defendants: Mr. Milyard, Ms. Dowis and Mr. Chamjock[3].  These defendants seek summary judgment, arguing that Mr. Self cannot sustain a claim based upon the facts presented.

## STANDARD

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The nonmoving party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324.  A fact is material "if under the substantive law it is essential to the proper disposition of the claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248. The Court will examine the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  *Concrete Works of Colorado, Inc. v. City and County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

---

[2] Plaintiff's brief dates this surgery as October 8, 2010.  However, the Court believes this is likely a clerical error based upon Dr. Fenton's deposition testimony.  [#64-3] at 25:4-6.  Additionally, the date of this surgery is not a material fact.

[3] Mr. Self's response refers to Dr. Paula Frantz, the Chief Medical Officer for CDOC, as if she would be a party to this action.  However, Dr. Frantz was never made a party to this action.

## CONCLUSIONS

### Claim Three: Fourteenth Amendment due process claim regarding DNR directive

Defendants argue that summary judgment is appropriate with respect to this claim because (1) the DNR directive was not violated, and (2) the prison has a legitimate penological interest in refusing to provide wristbands or some equivalent.

Defendants first argue that there is no evidence that defendants or anyone else actually violated the DNR directive, because Mr. Self was never in respiratory or cardiac arrest.   Frantz Aff. [#47-1] ¶ 91-92.  However, the emergency room physician at the hospital evaluated Mr. Self as having "respiratory arrest."  [#64-5].   Dr. Frantz may disagree, but this evidence alone creates a dispute of material fact as to whether or not Mr. Self experienced respiratory arrest and whether or not the DNR directive was violated.  Although defendants claim the nasal intubation did not serve to resuscitate him but rather "kept Plaintiff's airways open and prevent aspiration in the event he vomited," the Court will not make this disputed factual determination on summary judgment.

Defendants also maintain that CDOC has a legitimate penological interest in prohibiting wristbands or other visible methods of indicating that an inmate has a DNR directive.   A prison regulation, even if it impinges on inmates' constitutional rights, is nonetheless valid if it is reasonably related to a legitimate penological interest.  *Turner v. Safley*, 482 U.S. 78, 89 (1987). In determining whether a prison's policy is valid in these circumstances, courts consider: (1) whether there is a "valid, rational connection" between the prison policy and the legitimate interest that is used to justify it; (2) whether other avenues of exercising that constitutional right are available to the inmate; (3) the impact an accommodation of the asserted constitutional right will have on guards and other inmates; and (4) whether "ready alternatives" to further that

governmental interest are available.  *Id*. at 89-90.  Although any inferences about disputed facts must be drawn in Mr. Self's favor, the Court must also accord deference to prison authorities' views with respect to matters of professional judgment."  *Id*.; *See also Beard v. Banks*, 548 U.S. 521, 522 (2006)("[C]ourts owe substantial deference to the professional judgment of prison administrators.").

However, the evidence before this Court regarding the Sterling Correctional Facility's legitimate penological interest in precluding inmates from visibly displaying DNR directives is largely limited to Dr. Frantz's affidavit.  This Court has no knowledge as to whether all prisons employ this same policy or whether other prisons manage to allow inmates to display a DNR directive without disrupting prison safety and operation.  No other prison official has testified or submitted an affidavit regarding this issue.  The Court can only proceed with the facts before it.

According to Dr. Frantz, whose expertise, I note, is that of a medical doctor and the chief medical officer of the CDOC, claims that the CDOC has a legitimate penological interest in disallowing any kind of special wristbands or visible marker of an inmate's DNR for several reasons.  Frantz Aff. [#47-1] ¶¶ 108-122.  Dr. Frantz suggests that wristbands could be misused by gangs as gang identifiers and cause a security threat, or they could lead to inmate violence.  Inmates could coerce other inmates into signing DNR directives just to obtain the wristband.  Dr. Frantz also believes a visible DNR would raise confidentiality concerns, and even if the prison were to permit those inmates who wished to waive their confidentiality rights regarding the DNR directive to do so, the inconsistency of having some inmates with wristbands and others without would increase the likelihood staff error.

Preliminarily, the Court notes that this case exists precisely because of staff error, because medical personnel did not know about Mr. Self's DNR directive.  As a result, it is clear

that CDOC's implementation of an inmate's DNR directive was not sufficient when Mr. Self was found unresponsive in his cell.  I also note that even if there is a legitimate penological interest in prohibiting wristbands or necklaces, there still is the question as to why the regulation requiring an orange sticker on the file was not followed.

Mr. Self attempts to discredit Dr. Frantz's testimony by arguing that she cannot be trusted to protect inmates' fundamental rights.  He argues that much of her assertions regarding security concerns or gang activity are merely speculative and lack foundation.  Mr. Self specifically notes that Dr. Frantz refused to agree with "common-sense principle" that an "EMT is more likely to further investigate the presence of a DNR if they see a medical bracelet signifying that status…as opposed to someone who does not have a bracelet."  [#59] at 23; [#64-1] at 50:22-51:5.  Dr. Frantz understandably is vigorously defending prison policy.  Although the Court does give considerable deference to the professional judgment of prison administrators, such a dogged defense of policy causes the Court to question whether the second and fourth prong of *Turner* have really been considered, and whether alternatives to allow an inmate to exercise his right to refuse medical treatment may indeed exist.

"[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interest, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard."  *Turner*, 482 U.S. at 90.  Mr. Self suggests, for example, placing a colored sticker on the wristbands offenders already wear.  Although defendants respond that Mr. Self has failed to provide evidence that inmates do wear such wristbands, defendants do not claim that this is false.  [#74] at 9.  As a result, the Court considers this suggestion as a potential alternative that may accommodate a prisoner's rights as a *de minimis* cost to a valid penological interest.

Ultimately, however, the issue is before the Court today on a motion for summary judgment. The Court draws all justifiable inferences in Mr. Self's favor. *See Beard*, 548 U.S. at 529. Although it would have been helpful to have more evidence in the record, the Court nonetheless finds there is an issue of fact as to whether Sterling Correctional Facility has a legitimate penological interest in its policy of refusing to permit the use a wristband or equivalent to alert emergency medical personnel to a DNR directive. Accordingly, the motion for summary judgment is denied as to the third claim.

Claim Two: Eighth Amendment claim regarding wrist injury

The crux of this claim is that defendants violated the Eighth Amendment by deliberate indifference to timely and adequate treatment of a serious wrist fracture. Mr. Self argues that defendants failed to schedule timely post-operative appointments as ordered by his physician and failed to institute the physician's plan of care.

He places blame on former warden, Mr. Milyard, and on Health Services Administrator, Ms. Davis, for their collective failure as "gatekeepers" in ensuring that inmates receive proper medical care. Specifically, Mr. Self argues that their implementation of a policy requiring medical specialists to initiate the scheduling of follow-up appointments deprived him of the care he needed. Mr. Self also claims that Mr. Chamjock was deliberately indifferent to his medical needs by changing his pain medication and denying his request for a lower bunk restriction. He says these collective failures caused him unnecessary infliction of pain and severe and permanent deformity of his wrist. Defendants seek summary judgment, arguing that their actions did not violate the Eighth Amendment because they did not have the requisite subjective state of mind to establish a violation and because they did not personally participate in Mr. Self's care with respect to his wrist injury.

"Eighth Amendment claims alleging inadequate or delayed medical care…involve both an objective and a subjective component, such that [the court] must determine both whether the deprivation is sufficiently serious and whether the official acted with a sufficiently culpable state of mind." *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)(internal quotations omitted). The deprivation is "sufficiently serious" where a physician has diagnosed the condition as mandating treatment or where even a lay person would easily recognize the need for medical attention. *Garrett v. Stratman*, 254 F.3d 946, 949 (10th Cir. 2001). However, "delay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show that delay resulted in substantial harm." *Oxendine*, 241 F.3d at 1276 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000)).

An inmate must also establish the subjective component, which occurs when the prison official both "knows of and disregards an excessive risk to inmate health or safety." *Garrett*, 254 F.at 949 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). This prong requires a plaintiff to present evidence of a prison official's culpable state of mind. *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). The Supreme Court has analogized this prong to a criminal recklessness standard, where the official may be liable if she "consciously disregards a substantial risk of serious harm." *Id*. at 752 (citing *Farmer*, 511 U.S. at 836-38). "The deliberate indifference standard lies 'somewhere between the poles of negligence at one end and purpose or knowledge at the other.'" *Id*. at 751(quoting *Farmer*, 511 U.S. at 836).

The Court finds there are issues of material fact in dispute regarding the objective prong. Clearly the broken wrist required treatment, but whether the delay in treatment worsened Mr. Self's injury is a fact issue. The undisputed facts establish that Mr. Self did not receive his follow-up appointment with Dr. Fenton for over six months when he should have seen Dr.

Fenton within one month.  Dr. Fenton also testified that he gave Mr. Self wrist exercises and instructed him to flex his wrist down but not to use the full range of motion. [#64-3] at 42:5-22. However, during the six months before Dr. Fenton saw Mr. Self, prison staff had Mr. Self performing the full range of motion exercises, which Dr. Fenton testified could be harmful because they might lead to "further shortening or impaction."  *Id*. at 45:14-25.  As a result, there is an issue of fact whether the delay in care resulted in further harm and pain to Mr. Self's wrist.

To evaluate the subjective prong, the Court examines the record with respect to the individual defendants.

*Mr. Chamjock*

Mr. Self admits that Mr. Chamjock played a limited role in his treatment.  However, he maintains that Mr. Chamjock's actions of superseding his pain medication orders and denying a request for a lower bunk restriction constitute deliberate indifference to his medical needs.  In support of the medication claim, plaintiff cites to a deposition of Ms. Dowis.  [#64-2].  It appears that Mr. Chamjock changed Mr. Self's medication from Tylenol 3 three times a day for 21 days to twice a day for five days.

Although defendants dispute that Mr. Self can even rely on this deposition testimony to establish his claim against Mr. Chamjock, defendants also argue that a disagreement among medical care providers regarding dosage or type of medication does not rise to the level of deliberate indifference. *See Supre v. Rickets*, 792 F.2d 958, 962-63 (10th Cir. 1986).  Although true, the Court notes that Mr. Chamjock is a physician's assistant who appears to have altered a physician's prescription of pain medication instead of two physicians disagreeing about a course of treatment.  Nonetheless, the Court fails to see how a medical provider's decision to decrease an inmate's dosage and duration of pain medication rises to the level of deliberate indifference to

11

his medical needs.  Additionally, Mr. Self has not provided the Court with any case law supporting his contention that such an action violates the Eighth Amendment.

Finally, Mr. Self argues that Mr. Chamjock "cruelly discontinued Mr. Self's order for a 'lower bunk restriction' for no other basis than an earlier restriction had run its course." [#59] at 18.  Again, plaintiff's sole support for his contention is deposition testimony by Ms. Dowis, in which she explains that an offender can file an "emergency grievance," that Dr. Barry Goldsmith had ordered a lower bunk for Mr. Self for three weeks, and that Mr. Self sought a "permanent bottom bunk restriction." [#64-2] at 89.  Ms. Dowis agreed with the explanation that "Mr. Self had to go a different route, essentially to have his request reviewed." *Id.* at 91.

Mr. Self was not denied a lower bunk but was told he needed to use a different procedure. This does not violate the Eighth Amendment.  Accordingly, the Court dismisses all claims against Mr. Chamjock.

*Ms. Dowis*

Mr. Self's claims against Ms. Dowis arise from her position as the Health Services Administrator, arguing that she: (1) failed to supervise the prioritization of emergent care and the triaging of "kites"; (2) permitted non-medical personnel to respond to Mr. Self's grievances for health concerns; and (3) enforced the CDOC policy requiring outside specialists to initiate any follow-up appointments, which created the six-month delay in treatment to Mr. Self's wrist.

Mr. Self claims that he submitted between six to eight kites over a two-week period with no response.  However, Ms. Dowis was not aware of any particular kite and is not personally involved in the process of triaging kites.  Dowis Aff. [#47-3] ¶ 29.  "Individual liability under §1983 must be based on personal involvement in the alleged constitutional violation." *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997).  The plaintiff must allege an "affirmative link"

between the defendant's conduct and the constitutional violation. *Stidham v. Peace Officer Standards & Training*, 265 F.2d 1165, 1167 (10th Cir. 1991). Additionally, "[s]upervisory status alone does not create § 1983 liability." *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009). It does not appear that Mr. Self can establish a claim against Ms. Dowis with respect to her failure personally to supervise the triaging of kites.

Mr. Self maintains that Ms. Dowis' failure to supervise also extends to permitting non-medical staff to respond to medical kites. In other words, plaintiff suggests that Ms. Dowis may be "affirmatively linked" by her policy of not requiring medical staff to respond to medical kites. For example, in response to a kite seeking a new surgery, in which Mr. Self complained that he had a "bone pressing out" and a misaligned hand, a records technician responded: "It's usually up to the specialist to schedule his own follow-up appointments. However, Dr. Goldsmith has requested another appointment with Dr. Fenton. We will see if we can get rescheduled for as soon as possible." Dowis Depo. [#64-2] at 96:12-13. How this translates into a potential constitutional claim is not clear.

In her affidavit, Ms. Dowis describes how kites are processed. [#47-3] at 3-4. A triaging nurse reviews the kites to determine if it is emergent or urgent, and if a kite is deemed not urgent, it is entered into the computer system and seen on the basis of the urgency of the complaint. *Id*. ¶ 26. Accordingly, even though a records technician responded, the kite was still reviewed by medical personnel. The Court has no reason to doubt Ms. Dowis' description. Ultimately, there appears to be no evidence suggesting that Ms. Dowis was aware of any serious risk of harm to Mr. Self and disregarded that risk. Further, there is no evidence of any policy that medical staff do not review medical kites.

Mr. Self's claim but perhaps primary claim against Ms. Dowis is that her position as a Health Services Administrator makes her responsible for the enforcement of the "unconstitutional policy of forcing specialists to request follow-up appointments for offenders' treatment and, in the event that those appointments are for some reason not scheduled, refusing to initiate contact with those outside providers." [#59] at 17. The Court's knowledge of this policy is largely from Dr. Frantz's affidavit. She explains that CDOC contracts with an entity known as Correctional Health Partners to manage the referral and approval of medical care by outside specialists. [#47-1] ¶ 53. When an inmate is seen by an outside specialist, that specialist is then responsible for requesting approval for any additional appointments from Correctional Health Partners. Id. ¶ 54. Once the appointment is approved, central scheduling staff contacts the specialist to schedule the appointment. Id. ¶ 56. The medical clinic staff at the facility where the inmate is incarcerated is not normally involved in this process. Id. ¶ 57. "Outside care specialists and/or their scheduling staff are made aware of this process, and the CDOC usually finds that this process is effective and adequate for providing CDOC offenders with specialty medical care." Id. ¶ 60.

Although CDOC may usually find this process to be effective and adequate, it clearly failed Mr. Self. There is little doubt in this Court's mind that Mr. Self's injury did not receive the care and attention it needed. Dr. Frantz apparently believes that Mr. Self brought his problems on himself by the manner in which he used or did not use his cast or splint. That might be a contributing factor. However, it is virtually indisputable that he did not receive the follow-up care from the orthopedic specialists that they determined was necessary and appropriate. The system did not work as it should have. The issue for this Court, as regards to Ms. Dowis, is whether the blame for that can be attributed to her. Was she responsible for the policy or for the

manner in which it was implemented and enforced?  Did her involvement, if any, go beyond negligence to the point that the constitution is invoked.

It is certainly a fact that Mr. Self has not provided any evidence that Ms. Dowis was aware of his wrist injury or his need for treatment.  She was not personally involved in his patient care.  Ms. Dowis also says she did not know anything about Mr. Self's need for a follow-up appointment or about Mr. Self's requests for a follow-up appointment.  *Id*. ¶¶ 47-48.  Mr. Self argues by analogy that because counties can be held liable for a constitutionally deficient policy, *see, e.g., Garcia v. Salt Lake County*, 768 F.2d 303 (10th Cir. 1985), Ms. Dowis can be personally liable for this policy requiring specialists to initiate follow-up appointments because of her position as Health Services Administrator.  Even accepting this argument by analogy, Mr. Self still needs to present evidence of Ms. Dowis' culpable state of mind – that somehow by implementing this policy, Ms. Dowis knew of and disregarded an excessive risk to inmate health or safety.

Ms. Dowis maintains that Sterling does not have the ability to arrange for scheduling of appointments for specialists.  *Id*. at 80:5-13.  In reference to scheduling a follow-up appointment with Dr. Fenton, Ms. Dowis responded, "anything like this, we wouldn't do it."  *Id*. at 80:11-13.  As a result, the Court is not really clear on how this policy actually functions or where responsibility lies in scheduling.  I agree with the plaintiff that constitutional duty cannot be delegated and then ignored.  However, it is not at all clear from the record before the Court that it can be fairly said that Ms. Dowis did that.  Her personal responsibility regarding the enforcement of the policy, and whether Ms. Dowis may have had the requisite subjective intent with respect to the policy, are at most unclear.

At a minimum, Ms. Dowis is entitled to qualified immunity.  To defeat a claim of qualified immunity, plaintiff must show both a violation of a constitutional right and that the right was clearly established.  *See, e.g., Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10 Cir. 1995).  The Court has doubts, frankly, that plaintiff will be able to show that Ms. Dowis personally violated any constitutional right.  However, even if the Court assumes, for this purpose only, that Ms. Dowis might have violated a constitutional right, Mr. Self has done nothing to show or attempt to show that the constitutional right was clearly established.  To do so he must show that "reasonable persons in the defendants' position would have known their conduct violated that right."  *Garrett v. Stratman*, 254 F.3d 936, 951 (10th Cir. 2001). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Toevs v. Reid*, 646 F.3d 752, 755 (10th Cir. 2011).  Plaintiff has not shown, nor has he made an effort to show, that either the Supreme Court or the Tenth Circuit or any other jurisdiction has held that a policy such as the one at issue violates an inmate's constitutional rights.

*Mr. Milyard*

For the same reason, Mr. Milyard is entitled to qualified immunity.  Also, for many of the same reasons, the Court is skeptical that the fault that resulted in the lack of timely follow-up care for the wrist injury lies at his door.  There is minimal evidence in the record regarding Mr. Milyard's role.  Essentially, plaintiff says, "he was the warden, he was responsible for the overall management of the prison, and therefore, he was responsible for the implementation of all policies and procedures, and therefore, he must be liable if Mr. Self's constitutional rights were violated.

16

In summary, the Court is skeptical that plaintiff can establish a constitutional violation against either Ms. Dowis or Mr. Milyard in connection with the wrist injury.  Even if I take as a given that the wrist injury did not heal properly, and I assume that someone or something within the CDOC might be responsible in whole or in part for that result, the question is whether constitutional fault can be attributed to either of these individuals.  However, as indicated, their personal roles or responsibilities in respect to the enactment, implementation or enforcement of policies or procedures that might have been a contributing cause of the wrist injury suffered by Mr. Self is not clear on the present record.  Moreover, as a practical matter I note that, because of the dismissal of the damages claims, this case with be tried to the Court.  Trial is scheduled to begin in two business days.  A grant of partial summary judgment, dismissing the second claim, would still leave the third claim for trial.  Given all these circumstances, the Court concludes that it is wiser to resolve this issue in the context of the evidence to be presented at trial.

## **ORDER**

Motion [#47] is GRANTED IN PART AND DENIED IN PART.  The Court enters judgment in favor of the defendant Gatbel Chamjock and dismisses all claims and this civil action against him, with prejudice.  The Court orders that defendants Beverly Dowis and Kevin Milyard are entitled to the protection of qualified immunity with respect to all claims against them for money damages.  However, the Court denies the motion insofar as it sought dismissal of the second and third claims against Ms. Dowis and Mr. Milyard to the extent those claims seek equitable relief.

DATED this 19th day of July, 2012.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge